IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-00997-MSK-KLM

**DUKE UNIVERSITY, and**
**ALLERGAN SALES, LLC**

    Plaintiffs,

v.

**SANDOZ, INC.,**

    Defendant.

---

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND MOTION TO BIFURCATE**

---

**THIS MATTER** comes before the Court pursuant to the Plaintiffs' Motion to Bifurcate **(# 42)**, the Defendant's ("Sandoz") response **(# 51)**, and the Plaintiffs' reply **(# 64)**; and Sandoz's Motion for Summary Judgment **(# 47)**, the Plaintiffs' response **(# 68)**, and Sandoz's reply **(# 74)**.[1]

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

According to the Plaintiffs' Complaint **(# 2)**, Plaintiff Duke University ("Duke") is the owner of U.S. Patent No. 9,579,270 ("the '270 Patent"), covering "Methods for Treating Hair Loss Using Non-Naturally Occurring Prostaglandins." Duke has licensed its rights under the '270 Patent to Plaintiff Allergan Sales, LLC ("Allergan"). Allergan markets a product based on

---

[1]     Also pending is a motion **(# 43)** by the Plaintiffs seeking expedited consideration of the Motion to Bifurcate. Because this Order resolves the Motion to Bifurcate, the motion to expedite is denied as moot.

1

the '270 Patent under the brand name Latisse. Sandoz manufactures and markets its own product, a generic version of Latisse, which the Plaintiffs allege infringes on Claims 22 and 30 of the '270 Patent. Based on these facts, the Plaintiffs assert claims for induced and contributory patent infringement. Sandoz has asserted several counterclaims, some of which allege that the Plaintiffs have engaged in anticompetitive by filing previous patent infringement lawsuits, and another of which alleges patent misuse.[2]

The Plaintiffs now move **(# 42)** to bifurcate Sandoz's antitrust and patent misuse counterclaims from the patent infringement claims to stay this matter as to those counterclaims until the infringement issues have been resolved.

Separately, Sandoz moves **(# 47)** for summary judgment on all of the Plaintiffs' infringement claims, contending that those claims are precluded under the doctrine of collateral estoppel, arising from rulings made in prior infringement lawsuits between the parties.

## ANALYSIS

### A. Motion for Summary Judgment

To adequately address Sandoz's collateral estoppel motion, it is necessary to discuss, in some detail, the '270 Patent, its predecessors, and the history preceding this litigation. The '270 Patent describes a method for growing hair by topically applying a chemical compound known

---

[2] The Court notes that, although the parties engaged in considerable litigation in the Eastern District of Texas before this case was transferred here, it does not appear that Sandoz's Answer and Counterclaims appear on the docket of this action. (Nor, for that matter, do any other pertinent filings during this case's lifespan in the Eastern District of Texas.) Within 7 days of the date of this Order, the parties shall file in this Court: (i) a full docket sheet from Case No. 2:17-cv-00528-JRG in the Eastern District of Texas, from commencement of that action through the April 3, 2018 Order transferring the case; (ii) copies of all pleadings pertinent to this action that were filed in the Eastern District of Texas prior to transfer of this case; and (ii) copies of all Orders issued by the Eastern District of Texas concerning substantive matters pertinent to this action.

as a prostaglandin. Prostaglandins are molecules that bind to certain receptors on cells in a living body and change how such cells function. The human body produces a variety of prostaglandins; the general type at issue here is known as prostaglandin F or PGF. Within the general category of PGF are many variants, some naturally-occurring and some synthesized. These variants are referred to as PGF analogs. Analogs differ from one another by virtue of various molecules that can attach to base structure of the prostaglandin and which change its pharmacological properties. For example, the prostaglandin is much like a charm bracelet to which different charms can be attached at different points.

PGF analogs were the subject of research in the 1980s as a treatment for glaucoma (among other things), and by the end of the 1990s, several inventors had obtained patents covering the use of PGF analogs for glaucoma treatment. Most notably, Dr. Murray Johnstone obtained a patent for treating glaucoma via eyedrops containing a PGF analog that described using various esters, carboxylic acids, or other molecules at the "C1 location"[3] (*i.e.* a specific type of charm at a specific location on the charm bracelet), that caused the prostaglandin to bind with cells at a site called the FP receptor. Among the things Dr. Johnstone also noticed and reported in his patent application was that when the eyedrops came in contact with the skin of the eyelid – that is, when the drug was applied topically – some patients experienced increased growth and thickening of the eyelashes as a side effect. Shortly thereafter, Allergan had obtained a patent ("the '819 patent") for a glaucoma treatment that differed from Johnstone's, in that Allergan's method disclosed an amide group, rather than an acid or ester, at the C1 location. The compound in the '819 patent is known as "bimatoprost." The '819 patent did not make any

---

[3]  The patents seem to refer to this location as R1, rather than C1. Because the *Latisse* cases use the C1 label, this Court will follow suit.

mention of topical application of bimatoprost to the skin, nor did it indicate that hair growth was a possible side effect.

Eventually, inventors realized the commercial potential of using PGF analogs to stimulate eyelash growth for cosmetic purposes. This triggered another round of patent applications specifically directed at using PGF analogs for hair growth purposes, rather than as a glaucoma treatment. Duke's assignor obtained U.S. Patent Nos. 7,388,029 ("the '029 patent") – the predecessor to the '270 Patent at issue here – and Allergan obtained another patent, both of which covered topical application of bimatoprost (among others) for the purpose of growing hair. On the strength of these patents, Allergan began marketing a bimatoprost solution for eyelash growth under the brand name Latisse. When several manufacturers obtained approval to market generic competitors to Latisse, Allergan filed the first of several patent infringement suits.

In the first suit, which the parties refer to as *Latisse I*, Allergan sued the generic drugs' manufacturers, including Sandoz, for infringement of various claims of the '029 patent. The trial court in *Latisse I* made numerous findings, but the one most germane to the dispute here concerned the generic manufacturers' arguments that the combination of the then-existing teachings of Johnstone (that topical application of PGF analogs used to treat glaucoma are known to cause eyelash growth) and the '819 patent (that bimatoprost is type of PGF analog that can effectively be used to treat glaucoma) would have allowed a person of ordinary skill in the art to reach the conclusions of the '029 patent (that topical application of bimatoprost would be an effective method to stimulate eyelash growth), such that the '029 patent would be deemed invalid as obvious.[4] *Allergan, Inc. v. Apotex, Inc.*, 2013 WL 286251 (M.D.N.C. Jan. 24, 2013).

---

[4] A claim is not patentable if the differences between its teachings and the prior art are such that the subject matter as a whole would have been obvious to one with ordinary skill in the art at the time of the invention. *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1343

4

That trial court found that Johnstone and the '819 patent "are too limited and different from the '029 claims to make obvious the hair growth properties of the '029 compounds". The court noted that Johnstone's hair-growing compounds did not have an amide group at C1 like the '029 patent's compounds did. It further found that the '819 patent, which <u>did</u> disclose compounds with an amide group at C1, "does not supply the missing link" because, at the time, "C1 acids were thought to be required for activity at the FP receptor [to produce hair growth], and bimatoprost has an amide rather than an acid at the C1 position." The court stated that "bimatoprost was thought to exert activity on a receptor other than the FP receptor, and therefore was distinguishable from the Johnstone compounds."[5] The court pointed out that there were three PGF analogs being marketed as glaucoma treatments at the time, and each of the three had different hair growth side effects, with some promoting hair growth and others inhibiting it. Thus, the court found, "a person of skill in the art would not have reason to use bimatoprost as a topical hair growth agent based on bimatoprost's identity as a prostaglandin analog alone." (The court also found that objective considerations – most significantly the "unpredictable" nature of hair growth stimulators and Latisse's success and status as the only drug approved for eyelash growth – also weighed against a conclusion that the '029 patent's claims were obvious in light of Johnstone and the '819 patent.)

On appeal, the Federal Circuit reversed, holding that the asserted claims in the '029 patent were invalid as obvious. *Allergan, Inc. v. Apotex, Inc.*, 754 F.3d 952, 961 (Fed. Cir.

---

(Fed. Cir. 2013). The obviousness inquiry requires the court to determine: (i) the scope and content of the prior art, (ii) the differences between the prior art and the claims at issue, (iii) the level of ordinary skill in the art, and (iv) objective considerations, such as commercial success, long-felt but unresolved need, and the failure of others. *Id.*; *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012).

[5] *See infra.*

2014). The Federal Circuit criticized the trial court for "looking only at properties of the C1-amide group and, particularly, bimatoprost." "In doing so," the court explained, the district court "fail[ed] to take into account the full scope of the '029 patent claims," which were "not limited to compounds with a C1-amide group [but] encompasses thousands of permutations of PGF analogs, including structures with all kinds of functional groups at the C1 location, such as" acids and esters. Because the '029 patent claimed such a broad array of possible compounds, the court explained that the generic manufacturers "did not have the exacting burden of showing a reasonable expectation of success in using the narrow class of PGF analogs with C1-amide groups to treat hair loss, let along a reasonable expectation of success in using bimatoprost in particular." Rather, the manufacturers "had the burden of showing that any compounds within the broad genus claimed by the '029 patent, including those that did not have C1-amide groups, were obvious at the time of the invention."

The court went on to explain that this reasoning was "especially problematic" because the trial court had relied upon a "feature" unique to bimatoprost – it and other PGF analogs with an amide group at C1 would bind to a <u>variant</u> of the FP receptor found in some cells, not the "garden variety" FP receptor.[6] Although the court noted that the vast majority of the compounds disclosed in the '029 patent were those that bound to the normal FP receptor, the court noted that "Johnstone does not [ ] teach away from compounds that bind variant forms of the FP receptor." "On the contrary," the court explained, "Johnstone even provides an alternative preference for the PGF analogs that were known to have different FP receptor binding properties."

---

[6] The district court's opinion does not appear to discuss "variant" FP receptors at all. This Court assumes that the district court's reference to bimatoprost activating something "other than the FP receptor" might be what the Federal Circuit's "variant FP receptor" discussion is referencing.

6

The court rejected a contention that "the '029 patent represents compounds that are newly isolated or synthesized over those of Johnstone," explaining that "Johnstone taught squarely towards a new utility of a finite set of already identified and isolated compounds with properties that had already been characterized" (such as in the '819 patent). Thus, explained the court "following Johnstone, there was nothing left of a chemist to do" in order to <u>create</u> any new compounds that would stimulate eyelash growth; all that was necessary was to appreciate the use to which the existing compounds described in Johnstone and the '819 patent could be put.

Finally, the court also rejected the district court's findings that objective considerations, such as the "unpredictable" nature of hair growth treatments weigh against a finding of obviousness. The court found that the district court incorrectly assessed the difficulty of creating an effective hair-growing drug by considering a time <u>before</u> Johnstone's findings were reported; once Johnstone disclosed its findings, "the general characteristics of the hair growth art ceased to be relevant [because] Johnstone taught that . . . PGF analogs that were effective glaucoma drugs could grow hair." Thus, the Federal Circuit held that the asserted claims in the '029 patent were invalid as obvious.[7]

---

[7] *Latisse I* was not the only litigation involving these parties and this family of patents (although it is the only substantive ruling implicated by Sandoz's current arguments based on collateral estoppel). During the pendency of *Latisse I*, Allergan obtained patents that derived from the '029 patent and it commenced a new infringement suit (*Latisse II*) against the generic manufacturers based on those new patents. After the Federal Circuit's ruling in *Latisse I*, the manufacturers argued in *Latisse II* that the rulings in *Latisse I* operated to collaterally estop Allergan from asserting claims based on the new patents. The district court agreed and dismissed the *Latisse II* claims on collateral estoppel grounds. Allergan did not appeal.

Allergan then obtained yet another new set of patents derived from the '029 patent and commenced a third suit against the generic manufacturers (*Latisse III*). The trial court again applied collateral estoppel from *Latisse I* and dismissed the new claims, and the Federal Circuit affirmed that dismissal. *Allergan, Inc. v. Sandoz, Inc.*, 681 Fed.Appx. 955 (Fed. Cir. 2017) (*Latisse III*).

Allergan then sought to address the ruling in *Latisse I* by narrowing the scope of the '029 patent to claim only those PGF analogs that have a C1-amide group. The Patent Office granted Allergan's request, with the result being the instant '270 patent, on which Duke and Allergan now sue.

Here, Sandoz argues that Claims 22 and 30 of the '270 patent – the claims at issue here -- are substantially identical to the claims under the '029 patent at issue in *Latisse 1*. Sandoz argues that because the Federal Circuit found those claims to be invalid due to obviousness, this Court should apply the doctrine of collateral estoppel to determine obviousness and thus enter judgment in Sandoz's favor. In response, the Plaintiffs argue that the Federal Circuit's invalidation of the '029 patent was the result of that patent's breadth and the fact that it encompassed some of the same compounds that Johnstone taught, but it did not address bimatoprost, in particular. Thus, the Plaintiffs argue, the Federal Circuit's broader ruling invaliding the '029 patent does not necessarily compel the invalidation of the narrower '270 patent here.

The principles governing collateral estoppel are set forth in *Latisse III*. *Allergan, Inc. v. Sandoz, Inc.*, 681 Fed.Appx. 955 (Fed. Cir. 2017) Sandoz has the burden of showing: (i) that the issue to which preclusion is sought – whether the invention asserted in Claims 22 and 30 of the '270 patent is obvious in light of Johnstone and the '819 patent – is identical to the issue litigated in *Latisse I*; (ii) that the issue was actually determined in the prior proceeding; (iii) that the issue's determination was a critical and necessary part of the decision in the prior proceeding; (iv) that the prior judgment is final and valid; and (v) the party to be estopped had a full and fair opportunity to litigate the issue in the prior action. 681 Fed.Appx. at 959. On the first element, complete identity of the issues is not required; patent claims that use slightly different language

8

to describe substantially the same invention can satisfy this element if the differences between them do not materially alter the question of invalidity. *Id.* at 959-60.

Before turning to the issues, this Court pauses to note that it is not intending to, and should not be understood to, revisit the Federal Circuit's findings in *Latisse I*. Whether the Circuit Court's rulings in *Latisse I* are sound, consistent with then-existing law, or supported by the then-existing record are questions that are not before this Court today. Rather, this Court must assume that the Federal Circuit's *Latisse I* ruling was correct in both law and fact. The question for this Court is whether the obviousness issue determined in *Latisse I* is substantially the same as the issue raised by Sandoz here.

The fundamental issue determined by the Federal Circuit in *Latisse I* was whether certain claims in the '029 patent were invalidated as obvious due to a combination of the teachings of Johnstone and the '819 patent. There is no material dispute here that the claims in the current patent – the '270 patent – describe a narrower, but otherwise identical, subset of the claims in the '029 patent. In other words, both the '029 patent and the current '270 patent claim: (i) topical application, (ii) of a PGF analog, (iii) for the purpose of stimulating eyelash growth, but whereas the '029 patent described roughly a dozen possible molecules that could be placed at the C1 location – including carboxylic acid, an ester, an amide group, and so on -- the '270 patent is specific that that location can only be occupied by an amide group.

The difference in scope between the patents undercuts any argument that *Latisse I* resolved the same issue presented here. *Latisse I*'s analysis notes that the trial court considered the question of obviousness of the '029 patent only in the context of bimatoprost and concluded that the combination of Johnstone and the '819 patent did not render the use of bimatoprost as a hair growth agent obvious. The Federal Circuit disagreed, but <u>not</u> because it concluded that the

9

prior art made the use of bimatoprost obvious. Rather, the Circuit Court reversed because the '029 patent was so broad that *other* compounds it described were obvious extensions of the prior art. 754 F.3d at 962. On several occasions, the Circuit Court makes clear that it was not finding that a hair-growth claim limited to the use of bimatoprost would be considered obvious in light of Johnstone and the '819 patent. *See* 754 F.3d at 962 n. 4 ("the appellants' obviousness arguments regarding the '029 patent were [not] limited to the obviousness of bimatoprost"); at 963 (characterizing the generic manufacturer's hypothetical burden of proving obviousness based solely on bimatoprost would be "exacting" if not worse, compared to the relatively easy burden of challenging the broad '029 patent); at n. 8 (conceding that Johnstone's teachings towards "the vasodilatory compounds taught in the parent of the '819 patent" would not include bimatoprost); at 966 (suggesting that the district court's findings regarding bimatoprost's effect "is not relevant to the '029 patent's actual claimed invention," due to that patent's breadth). Without a clear indication that the Federal Circuit was specifically deciding that a claim based narrowly on the use of only bimatoprost would be invalidated as obvious by Johnstone and the '819 patent, this Court cannot conclude that the question of whether the narrow '270 patent was necessarily decided by the Federal Circuit's analysis of the broad '029 patent in *Latisse I*.[8]

Accordingly, because the Court does not find that the particular obviousness issues Sandoz raises here with regard to the '270 patent were necessarily decided by the Federal Circuit in the context of the '029 patent in *Latisse I*, the Court finds that Sandoz has not carried its

---

[8] This is not to say that the '270 patent will necessarily survive an obviousness challenge in this case. Portions of *Latisse I*'s obviousness analysis sweep fairly broadly, making the "gap" that must be bridged between Johnstone and the '819 patent fairly thin. And *Latisse I*'s finding that Johnstone teaches towards the use of PGF analogs that bind to the variant FP receptor narrow that gap even more. But because the question of obviousness itself is not yet before this Court, the Court need not make any findings on that point at this time.

burden of showing that the Plaintiffs are collaterally estopped by the *Latisse I* ruling. Sandoz's Motion for Summary Judgment is therefore denied.

**B. Motion to bifurcate**

The Plaintiffs move **(# 42)** to bifurcate Sandoz's counterclaims sounding in anticompetitive behavior and patent misuse, arguing that discovery and trial relating to those counterclaims should be stayed until the Plaintiffs' infringement claims are resolved. Although Sandoz initially opposed this motion, the parties subsequently entered into a Joint Motion to Bifurcate and Stay Discovery **(# 76)** regarding Sandoz's counterclaims, which this Court referred to the Magistrate Judge and the Magistrate Judge granted **(# 90)**. As a result, the instant Motion to Bifurcate has been rendered moot, and the Court denies it as such.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs' Motion to Bifurcate **(# 42)** and Plaintiffs' Motion to Expedite **(# 43)** consideration of the Motion to Bifurcate are **DENIED AS MOOT**. Sandoz's Motion for Summary Judgment **(# 47)** is **DENIED**.

Dated this 18th day of September, 2019.

                                                                **BY THE COURT:**

                                                                 Marcia S. Krieger
                                                                 Senior United States District Judge